## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHRISTY MULLIGAN and ANDREW LIVANIS,** individually and on behalf  a class of participants in the Long Island University Retirement Plan,<br><br>          Plaintiffs,<br><br>**vs.**<br><br>**LONG ISLAND UNIVERSITY,**<br><br>          Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

### INTRODUCTION

1.      This action seeks to protect the retirement savings of more than 4,000 employees of Long Island University ("University" or "Defendant") who are participants in the University's federally-regulated retirement plan—the Long Island University Retirement Plan ("Plan"). The University has a fiduciary duty to ensure that its Plan does not charge excessive fees. But over the past six years, Plan has paid more than two million per year in recordkeeping, distribution, and mortality risk fees (sometimes collectively referred to herein as "administrative fees"). These fees are roughly ten times what they should be. The fees are grossly excessive. And Plan participants will continue to pay grossly excessive fees unless this action moves forward.

2.      All retirement plans require administrative services. The University contracted with TIAA to provide such services for its Plan. TIAA pockets the bulk of the excessive fees. The reason why TIAA has been able to extract such grossly excessive fees is because TIAA's fees are tethered not to any actual services it provides to the Plan, but rather, to a percentage of assets in the Plan. As the assets in the plan increase, so too increase the fees that TIAA pockets from the

Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket, but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe.

3.     This action is similar (but narrower in scope) to 18 separate lawsuits pending in federal district courts around the country.[1] In each of these other lawsuits, like here, plaintiffs allege a university defendant breached ERISA fiduciary duties by allowing TIAA to collect excessive fees from the university's retirement plan. It appears TIAA exploited its rich heritage of being a non-profit, low-cost financial service provider and duped universities into excessive fee arrangements. But now university plan participants are fighting back and demanding that TIAA's fees be reduced. It appears TIAA is willing to meaningfully reduce its fees if universities will just ask. By way of example, shortly after the University of Chicago was sued it announced to its plan participants that it renegotiated TIAA's administrative fees, and that it successfully reduced fees on an annual basis by several million dollars.

4.     The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the plan, the University is obligated to act for the exclusive benefit of the Plan and its participants, and to ensure

---

[1] *See Sweda v. Univ. of Pa.*, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017), appeal docketed, No. 17- 3244 (3d Cir. Oct. 13, 2017); *Short v. Brown Univ.*, No. 17-cv-318 (D.R.I. filed July 6, 2017); *Cates v. Trs. of Columbia Univ. in the City of N.Y.*, No. 16-cv-6524 (S.D.N.Y. filed Aug. 28, 2016); *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (S.D.N.Y. filed Aug. 17, 2016); *Clark v. Duke Univ.*, No. 16-cv-1044 (M.D.N.C. filed Aug. 10, 2016); *Henderson v. Emory Univ.*, No. 16-cv-2920 (N.D. Ga. filed Aug. 11, 2016); *Stanley v. George Washington Univ.*, No. 18-cv-878 (D.D.C. filed Apr. 13, 2018); *Kelly v. Johns Hopkins Univ.*, No. 16-cv-2835 (D. Md. filed Aug. 11, 2016); *Divane v. Northwestern Univ.*, No. 16-cv- 8157 (N.D. Ill. filed Aug. 17, 2016); *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (S.D.N.Y. filed Aug. 9, 2016); *Nicolas v. Trs. of Princeton Univ.*, No. 17-cv-3695 (D.N.J. filed May 23, 2017); *Daugherty v. Univ. of Chi.*, No. 17-cv-3736 (N.D. Ill. filed May 18, 2017); *Munro v. Univ. of S. Cal.*, No. 16-cv-6191 (S.D. Cal. filed Aug. 17, 2016); *Cassell v. Vanderbilt Univ.*, No. 16-cv-2086 (M.D. Tenn. filed Aug. 10, 2016); *Davis v. Wash. Univ. in St. Louis*, No. 17-cv-1641 (E.D. Mo. filed June 8, 2017); *Vellali v. Yale Univ.*, No. 16-cv-1345 (D. Conn. filed Aug. 9, 2016); *Wilcox v. Georgetown Univ.*, 18-cv-00422 (D.C.C. filed Feb. 23, 2018).

that the Plan's expenses are reasonable.

5.      The marketplace for retirement plan administrative services is established and competitive, and because the Plan here has more than $800 million in assets, the Plan has tremendous bargaining power to demand high-quality, low-cost services.

6.      But instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, the University has failed to adequately take proper measures to understand the real cost to Plan participants for TIAA's services, to properly inform participants of the fees they are paying to TIAA as required by law, and most importantly, to act prudently with such information. As a result, Plan participants pay excessive fees to TIAA for the services TIAA provides to the Plan.

7.      The named plaintiffs in this action, Dr. Christy Mulligan and Dr. Andrew Livanis (collectively, "Plaintiffs"), were hit especially hard. It appears they have been paying several hundred dollars per year to TIAA in fees when a reasonable fee for such services is no more than $60 per year. There is absolutely no legitimate basis why Plaintiffs should be paying TIAA more than $60 per year for services.

8.      Plaintiffs, individually and as a representative of participants in the University retirement Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from each breach of fiduciary duty.

## JURISDICTION AND VENUE

9.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331, because it is an action under 29 U.S.C. §1132(a)(2) and (3).

10.    This district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b), because it is the district in which the Plan is administered, where the alleged breaches took place and where the University resides.

## THE PLAN

11.    The Long Island University Retirement Plan is a defined contribution benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

12.    The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

13.    The Plan is organized under section 403(b) of the Internal Revenue Code. A 403(b) plan is a tax-deferred retirement plan, and is virtually identical to a 401(k) plan. Plans offered by corporate employers that allow participants to defer part of their compensation by contributing to the plan are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including universities), and churches are eligible to offer plans qualified under 403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A). The law allows tax-exempt organizations to be exempt from certain administrative processes that apply to 401(k) plans. In other words, administrative costs for 403(b) plans are typically lower than for 401(k) plans. This allows organizations with very small budgets to help their employees save for retirement.

14.    403(b) plans are subject to ERISA and its fiduciary requirements, unless the plan satisfies a safe harbor regulation based on the employer having limited involvement in operating the plan. Here, the Plan does not qualify for the safe harbor and is thus subject to ERISA because the University is actively involved in operating the Plan.  The annual tax return for the Plan filed on Form 5500 explicitly acknowledges that the Plan is subject to ERISA.

15.    All University employees are eligible to participate in the Plan, unless an employee

falls into one of the following categories of excluded employees: (1) regularly scheduled to work fewer than 20 hours per week; (2) non-resident aliens who receive no income from within the United States; (3) students enrolled and attending classes at the University; (4) independent contractors. Participants in the Plan have individual accounts. The Plan allows employees to set aside pre-tax dollars out of paychecks to save for retirement – up to $18,000 per year, and in certain circumstances more. The University provides direct contributions related to the base salary of employees who qualify.

16.     The Plan has over $800 million of assets under management. Retirement plans are generally classified as "micro" plans when they have $5 million or less in assets under management, "small" plans when they have between $5 and $50 million in assets, "mid" plans when they have between $50 and $200 million, "large" plans when they have between $200 million and $1 billion, and "mega" or "jumbo" plans when they have over $1 billion in assets. With more than $800 million in assets, the Plan easily qualifies as a "large" plan. The Plan had 4,140 participants with account balances as of the period ending December 31, 2016.

## THE PARTIES

17.     Plaintiff Christy Mulligan is a citizen of New Jersey. Dr. Mulligan is a participant in the Plan as defined in 29 U.S.C. §1002(7). Since 2008, Dr. Mulligan has been employed by the University in various faculty positions within the Department of Counseling and School Psychology. She has been a participant in the Plan since 2010. Dr. Mulligan has a substantial portion of her life savings in her Plan account.

18.     Dr. Mulligan is currently employed by the University as an Assistant Professor/Coordinator in the School Psychology Program.

19.     Plaintiff Andrew Livanis is a citizen of New York. From September 2005 through

December 2017, Dr. Livanis was employed by the University in various faculty positions within the Department of Counseling and School Psychology.  Dr. Livanis is a participant in the Plan as defined in 29 U.S.C. §1002(7). Upon information and belief, Dr. Livanis has been a participant in the Plan since 2010. Dr. Livanis has a substantial portion of his life savings in his Plan account.

20.     An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have suffered such an injury because they paid excessive administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan.

21.     The University was founded in 1926 in Brooklyn, New York. It is one of the nation's largest private universities. The University offers more than 500 undergraduate, graduate, and doctoral degree programs and certificates, educating more than 20,000 students each year across multiple campuses.

22.     The University is the Sponsor of the Plan under 29 U.S.C. §1002(16)(A)(i). The University has appointed a Retirement Plan Committee consisting of University executive level employees to serve as the Plan Administrator. As Plan Administrator, the Retirement Plan Committee has full discretionary power to construe and interpret the Plan and has full

responsibility for administering the Plan. This includes the power to determine questions relating to the Plan (including an employee's eligibility to participate in the Plan); to administer and pay benefits; to establish rules for administering the Plan; to delegate administrative responsibilities; and to disburse money from the Plan for administrative, legal, advisory and other costs incurred in administering the Plan.

23.     The University is a fiduciary to the Plan because it exercises discretionary authority or discretionary control respecting the management of the Plan, and exercises authority or control respecting the management or disposition of the Plan's assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. *See* 29 U.S.C. §1002(21)(A)(i) and (iii).

## BACKGROUND FACTS

### A.     403(b) Plan Fees

24.     While everyone who participates in a 403(b) plan pays fees to the plan provider to maintain their account, industry insiders report that over 70 percent of people do not believe they pay any fees to their plan provider. In an effort to help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor finalized regulations in 2010 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

25.     By way of example, the quarterly account statements that the University provides to its Plan participants do not disclose any fees paid to TIAA by its participants. In addition, the Plan's annual Form 5500 Department of Labor disclosures are supposed to identify the indirect

fees paid to TIAA, but they do not disclose this information either. TIAA's indirect compensation should be clearly disclosed in the Plan's Form 5500s, but it is not. The failure to disclose TIAA's fees is a failure of process and suggests the University does not even know how much in fees TIAA receives from Plan participants.

26.     A plan's fiduciaries have control over plan fees. The fiduciaries are responsible for hiring administrative service providers for the plan and for negotiating and approving the amount of fees paid to those administrative service providers. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35 year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).

27.     As reflected in the charts below, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings.





28.     Accordingly, fiduciaries must engage in a rigorous process to control fees and ensure that participants pay no more than a reasonable level of fees. This is particularly true for $800 million dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to $800 million dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

29.     The entities that provide administrative services to retirement plans have a strong incentive to maximize their fees. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce the plan's fees.

30.     Fiduciaries must be cognizant of service providers' self-interest in maximizing fees, and not simply accede to the providers' demands, or agree to the providers' administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting fees demanded by these conflicted providers.

31.     Service providers will sometimes agree publically to charge lower fees than they

actually charge to plans of a certain size. So it is here. TIAA has publically agreed to charge lower fees to plans the size of the Plan than what it is actually charging the Plan.

32.     TIAA originally had a single class structure. This means that it had the same expense ratios for its investments across retirement plans of all sizes. On April 24, 2015, however, TIAA expanded each of its investment options from one class to three classes, designated as R1, R2, and R3. As a result, identical TIAA investments have different expense ratios. TIAA stated, "[t]his multi-class structure allows us to better reflect the actual administrative and distribution expenses across the range of clients we serve and brings this important offering further in line with the marketplace." *See* College Retirement Equities Fund (CREF) Multi-Class Summary: A new class structure began April 24, 2015. The expense ratio represents the amount of fees TIAA extracts from plan participants on an annual basis who invest in TIAA products. Shown below is how the expense ratio changed for each of the new classes.

| TIAA Class | Previous Expense Ratio | New Expense Ratio |
|---|---|---|
| R1 | .24% | .35% |
| R2 | .24% | .20% |
| R3 | .24% | .10% |

Eligibility for share classes is determined based on a plan's total assets in TIAA products, as follows.

| Total TIAA Assets | TIAA Class |
|---|---|
| Less than $20 million | R1 |
| $20 million up to $400 million | R2 |
| $400 million or more | R3 |

TIAA offers identical services at lower costs to plans with substantial assets. Notably, here, the Plan has nearly $680 million invested in TIAA products. As such, the Plan easily qualifies for the lowest R3 share class. However, the Plan offers the more expensive R2 share class to participants. This means that because of the wrong share class designation alone, the Plan is paying TIAA

double the amount of fees that TIAA has publically offered to charge the Plan.

33.      It is also notable that prior to April 24, 2015, TIAA's publically available fee charts indicate that it was charging the Plan .24% of TIAA assets in participant accounts for certain fees. After April 24, 2015, TIAA voluntarily began charging the Plan .20% (even though the Plan qualified for the 10% fee level). This reduction by TIAA was tantamount to an admission on TIAA's end that the .24% fee was excessive. The University had a duty of prudence to examine and negotiate a fair fee for TIAA's services. But instead it allowed TIAA to control the process and accepted whatever TIAA demanded, even when TIAA demanded fees that were in excess of TIAA's publically available fee charts.

### B.      Administrative Services

34.      Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

35.      There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo retirement plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business,

particularly for jumbo plans like the Plan here.

36.     The ten largest United States recordkeepers based on total assets under management are: 1. Fidelity ($1.6 trillion); 2. TIAA ($460 billion); 3. Empower Retirement ($443 billion); 4. Vanguard ($437 billion); 5. Voya Financial, Inc. ($311 billion); 6. Wells Fargo ($228 billion); 7. Bank of America Merrill Lynch ($220 billion); 8. Conduent ($195 billion); 9. Principal Financial Group ($164 billion); 10. T. Rowe Price ($156 billion). All of these companies provide similar services and primarily differentiate themselves based on price.

37.     There are two primary methods for 403(b) plans to pay for administrative services: "direct" payments from the plan participants' accounts, and "indirect" payments by diverting money from plan investments. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

38.     In a typical direct payment arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $60 per plan participant. Often, these fixed-level fees are charged directly to each participant's account on a quarterly basis.  Mega or jumbo plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 4,000 participants can obtain much lower fees on a per-participant basis than a plan with 400 participants.

39.     A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $300,000 account balance is the same as a $3,000 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do

with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

40.     For example, a plan with 30,000 participants and $3 billion in assets, may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 30,000 participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $60 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $1,800,000 direct annual fee (30,000 participants at $60 per participant). If the plan's assets double and increase to $6 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not double like the plan assets did.

41.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $60 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $60 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $3 billion plan in this example, each participant would pay a direct administrative fee of 0.0006% of his or her account balance annually for recordkeeping ($1,800,000/$3,000,000,000 = 0.0006). If plan assets increase thereafter, the percentage would be adjusted *downward* so that the plan is still paying the same $1,800,000 price that was negotiated at the plan level for services to be provided to the plan.

42.     Plan administrative service providers offer an array of other fee and expense

models. These often include some combination of dollar per head and asset based approaches. Plaintiffs here are specifically not alleging that the University was required to use a direct payment arrangement. Rather, Plaintiffs are simply providing details on how direct payment methods operate and provides these details to partially illustrate (together with all the allegations herein) that the fees Plan participants are paying to TIAA are excessive and unreasonable and that the University should have done more to investigate, monitor, solicit bids, negotiate, and secure reasonable administrative fees for Plan participants.

43.      The University uses a method of paying for recordkeeping for the Plan through indirect revenue sharing payments. Revenue sharing, while not a *per se* violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped, as demonstrated by the University's Plan.

44.      In a revenue sharing arrangement, the amount of compensation for administrative services to the plan is not based on the actual value of such services, instead compensation is based on the amount of assets in the plan, or amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in the Plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of example, if a recordkeeper contracts to receive annually one percent of assets in the plan as indirect compensation for a plan with 100 participants and $600,000 in plan assets, the recordkeeper would receive $6,000 per year in fees, or $60 on a per plan participant basis. But if the plan assets increased to $1,000,000,000 – and the contract remains the same, the recordkeeper receives $10,000,000 per year in fees, or $100,000 per year from each plan participant for providing the exact same services to each plan participant. This would be an excessive fee by any measure. This example illustrates the problem

with asset-based fees that remain unchecked. If such fees remain unchecked, they will become excessive. So it is here.

45.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

46.     As to the second critical element—determining the price that would be available on a flat per-participant basis, or the price available under other fee models—making that assessment for a plan with $800 million in assets requires soliciting bids from competing providers. Benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for large and jumbo plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids.

47.     Prudent fiduciaries will also hire industry experts like Mercer Investment Consulting, Aon Hewitt and Towers Watson to work on their behalf to obtain competitive bids and negotiate fee agreements with recordkeepers. By way of example, California Institute of Technology (CalTech) hired Mercer Investment Consulting to help it renegotiate the administrative fees its retirement plan paid TIAA. CalTech was subsequently successful in securing $15 million in rebates from TIAA, and lower fees going forward.

48.     Industry experts recognize that it is especially important in a university 403(b)

context to scrutinize administrative fees and obtain competitive bids for administrative services. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." *See* Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2*. Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal*. Engaging in in this RFP process "allows plan sponsors . . . to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of 403(b) plans should obtain competitive bids for recordkeeping at regular intervals of approximately three years.

### D.    TIAA

49.    TIAA is the recordkeeper for the Plan. It keeps track of the amount of each Plan participant's investments in the various options in the Plan, and provides each participant with a quarterly account statement. TIAA maintains a website and call center that participants can access to obtain information about the Plan and to review their accounts. TIAA also provides access to investment education materials or investment advice. The services TIAA provides to the Plan are virtually identical to the administrative services provided by all of the leading plan administrative service providers.

50.    In the early 1900s, teachers had no access to pensions that would help them live comfortably in retirement. In 1918, the Carnegie Foundation donated $1 million to fund Teachers Insurance and Annuity Association, which is now known as TIAA. Its goal was to "ensure that teachers could retire with dignity."

51.    For decades, TIAA grew by operating as a non-profit organization and providing

low cost retirement services to the nation's universities, colleges, school districts, and other non-profits. Because of its unique and noble heritage, TIAA's reach grew to epic proportions. It today has over $1 trillion dollars of assets under management.

52.     TIAA still markets itself as a non-profit organization. That is misleading. In 1997, Congress revoked TIAA's non-profit status because TIAA was competing directly with for profit companies. After TIAA's non-profit status was revoked, TIAA began to impose steep fees on clients and to push its clients into products that do not add value and may not be suitable but generate higher fees for TIAA.

53.     According to several recent articles in The New York Times, TIAA management assigned outsized sales quotas to its representatives and directed them to meet the quotas by playing up customers' fears of not having enough money in retirement and other "pain points." *See e.g., The Finger-Pointing at the Finance Firm TIAA*, Morgenson, Gretchen, New York Times, Oct. 21, 2017. These allegations are echoed in a whistle-blower complaint filed against the company with the Securities and Exchange Commission. The whistle-blower complaint contends that TIAA began conducting a fraudulent scheme in 2011 to convert "unsuspecting retirement plan clients from low-fee, self-managed accounts to TIAA-CREF-managed accounts" that were more costly. Advisers were pushed to sell proprietary mutual funds to clients as well, the complaint says. The more complex a product, the more an employee earned selling it.

54.     In October 2015, TIAA was sued by its own employees who alleged that TIAA breached its fiduciary duty by charging excessive fees and expenses to participants in TIAA's own employee retirement plan. TIAA settled the lawsuit with a $5 million payment and by reducing its fees by an estimated $2 million per year.

55.     TIAA's executive pay packages also illustrate that TIAA is an aggressive profit-

seeking enterprise. The compensation of TIAA's executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment companies. In 2016, TIAA's CEO received $18.5 million in compensation. TIAA's CEO received more compensation than the CEO of J.P. Morgan Chase, Citigroup, MetLife, and Deutsche Bank among many others. When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies. TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015.

56.     There is no shortage of high quality, low cost alternatives to TIAA's recordkeeping services for 403(b) plans. Indeed, recently several universities acting as prudent 403(b) fiduciaries have engaged in a comprehensive review of TIAA fees and made substantial changes to their 403(b) plans for the benefit of plan participants.

57.     Loyola Marymount University (LMU) provides a 403(b) plan to its employees. TIAA was a recordkeeper for LMU's plan. LMU hired an independent third party consultant Aon Hewitt, to issue a request for proposal to seven different 403(b) recordkeeping providers. After receiving responses from the recordkeepers, LMU elected to terminate its recordkeeping contract with TIAA and executed a recordkeeping contract with Diversified Investment Advisors. The process resulted in a reduction of administrative fees totaling several million per year.

58.     Pepperdine University retained an independent third party consultant to assist it in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, Pepperdine terminated its contract with TIAA and selected Diversified Investment Advisors to be its plan's recordkeeper. A move that saved the plan millions in administrative fees.

59.     Purdue University hired an independent third party consultant, EnnisKnupp &

Associates (n/k/a AonHewitt), to assist its plan in evaluating fees and recordkeeping services. Purdue issued a request for proposal to several recordkeepers. Following the bidding process, Purdue terminated its recordkeeping contract with TIAA and selected Fidelity to be its recordkeeper. Purdue told participants the change – along with others – would increase participant balances by an estimated $3-4 million per year which is then compounded over time.

60.     The University of Notre Dame also hired EnnisKnupp & Associates (n/k/a AonHewitt), to assist its plan in evaluating fees and recordkeeping services. Notre Dame issued a request for proposal to several recordkeepers. Following the bidding process, Notre Dame terminated its recordkeeping contract with TIAA and selected Fidelity to be its recordkeeper.

61.     Extensive industry literature shows that LMU, Pepperdine, Purdue, and Notre Dame are not outliers, and that similarly situated fiduciaries who have comprehensively reviewed their plans have been able to reduce administrative and recordkeeping fees, leading to enhanced outcomes and retirement security for their plans' participants.

## DEFENDANT BREACHED ITS FIDUCIARY DUTY OF PRUDENCE

62.     Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by TIAA, the Plan's participant level, and the recordkeeping market, benchmarking data indicates that a reasonable recordkeeping fee for the Plan would have been no more than a fixed amount of $250,000 per year (approximately $60 per participant with an account balance). TIAA, however, is collecting more than $2,000,000 per year (on average approximately $492 per participant with an account balance).

63.     The excessive fees TIAA collects from the Plan demonstrates that, in contrast to with the 403(b) plan reviews conducted by the universities described above, Defendant here failed to engage in a similar analysis. Defendant did not retain a third party to review TIAA's fees.

Defendant did not act on the information about fees in its possession as a prudent fiduciary would. Defendant did not seek competitive bids for services TIAA provides. Had Defendant done so, Defendant would not have allowed the Plan to continue to pay TIAA excessive fees.

64.     TIAA's fees are so extraordinarily high that had Defendant employed a prudent fiduciary process, Defendant could have reduced the fees without sacrificing any of the services provided to the Plan. Defendant failed to balance fairly the costs of administering the Plan and the amount of fees the Plan paid to TIAA for services that TIAA actually provided to the Plan. Indeed, TIAA provides virtually the same services as many other service providers in the marketplace, TIAA's services do not justify the excessive fees paid by the Plan. TIAA's fee is so disproportionately large that it bears no reasonable relationship to the services rendered.

65.     A reasonable fact finder could easily infer from the extraordinary amount assessed against the Plan for administration and related fees, the failure to adequately report TIAA's compensation on the Plan's Annual Report on Form 5500, and the failure to adequately disclose to participants the amount they were paying in fees as required by 29 CFR § 2550.404a-5, that something must be wrong with the process by which the Defendant protects the interests of its employees and Plan participants. The principle of *res ipsa loquitur* applies. But there is substantial other evidence of fiduciary process failure that corroborates that inference and principle of *res ipsa loquitur*.

66.     In a 2012 TIAA publication entitled "Plan Sponsor Service and Fee Disclosure Guide," TIAA explained to its plan sponsor customers that recent changes to the annual reporting obligations for employee benefit plans on Schedule C of Form 5500 required enhanced reporting to the help fiduciaries review plan fees and expenses as a part of their ongoing obligation to monitor their service provider arrangements."

67.     But not a single annual report filed with the Department of Labor on Form 5500 for the Plan includes any disclosures of the amount of indirect compensation being received by TIAA from the Plan. It is the responsibility of the University to ensure that the annual disclosure is complete and accurate, and to report to the Department of Labor any service provider who fails or refuses to provide compensation information required to be include on the Form 5500. Yet we know with certainty that TIAA is receiving indirect compensation. The failure to report its compensation as required by law is not only evidence of a major fiduciary process failure but also strongly suggests that the University is failing to understand, monitor, and cap TIAA's fees.

68.     Beginning in 2012, final regulations issued by the DOL, 29 CFR 2550.408b-2(c), required every retirement plan recordkeeper to disclose to each plan's responsible plan fiduciary a description of the services being provided by that recordkeeper and all of the direct and indirect compensation the recordkeeper expected to receive in connection with those services (the "408b-2 Disclosure"). On information and belief the 408b-2 Disclosure provided by TIAA disclosed only a portion of the fees TIAA expected to receive from the Plan.

69.     The participant loan program administered by TIAA operates in clear violation of the prohibited transaction rules and the conditions for the regulatory exemption from those prohibited transaction rules regarding Plan loans, and yet Defendant approved that Plan loan program apparently in complete ignorance of the legal requirements for such a program.

70.     Ordinarily, when a plan participant borrows from a plan account, the participant is deemed to have invested the account in the loan. The loan proceeds are derived from liquidating the participant's investment, and the loan effectively becomes a "fund" in which the participant has invested. As an example, suppose that a participant has a current plan account balance of $60,000, allocated equally among three different mutual funds, Fund A, Fund B, and Fund C, and the participant elects to borrow $6,000 from the plan account. The plan trustee will liquidate $2,000 from each of the

three investment funds and will distribute the $6,000 to the participant in exchange for a note signed

by the participant, obligating the participant to repay the loan at a stated rate of interest.

71.     The usual retirement plan loan process is exemplified by the description in the Charles

Schwab standardized loan policy for 401(k) plans:

> ***Each loan shall be an earmarked investment of the Participant's account.*** Subject
> to any restrictions on withdrawals from a particular investment fund, loan proceeds
> will be taken pro rata from the investment fund or funds in which the Participant's
> account balance is invested. However, loan proceeds will ***not*** be taken from any
> portion of a Participant's account that is invested in an employer stock investment
> fund. If a Participant has a Personal Choice Retirement Account®, such Participant
> will be contacted if funds in this account need to be liquidated to provide loan
> proceeds. As a loan is repaid, a Participant's payments will be allocated to the
> investments he or she has selected under the Plan (or, where appropriate,
> investments that are considered the Plan's default investment fund(s)) on a pro-rata
> basis, based on the investment election in effect on the date a payment is deposited
> to the Plan. (Emphasis added.)

72.     Participant loans are governed by 29 CFR § 2550.408b-1, which requires, among

other conditions, that a loan must bear a reasonable rate of interest. As provided in 29 CFR §

2550.408b-1(e), "[a] loan will be considered to bear a reasonable rate of interest if such loan

provides ***the plan*** with a return commensurate with the interest rates charged by persons in the

business of lending money for loans which would be made under similar circumstances."

(Emphasis added.)

73.     Suppose at the time of the participant's loan, the commercial rate for such loans is

6%. As a result of the loan transaction described in paragraph 83, the participant's account will

have $18,000 invested in each of Fund A, Fund B, and Fund C, and will have $6,000 invested in

a loan paying 6% interest. All of the installment loan repayments will be credited to the

participant's account, and the participant will earn the rate of interest charged on the loan.

74.     Loans made through TIAA do not follow this loan process. Instead, TIAA's loan

process requires a participant to borrow from TIAA's general account rather than from the

participant's own account. In order to obtain the proceeds to make such a loan, TIAA requires each participant to transfer 110% of the amount of the loan from the participant's chosen investments—in our example, Fund A, Fund B, and Fund C—to one of TIAA's general account products[2] as collateral securing repayment of the loan. The general account product pays a fixed rate of interest, currently guaranteed to be 3%.

75.     All of the assets held in TIAA's general account are owned by TIAA. Therefore, TIAA also owns all the assets transferred to its general account to "collateralize" the participant loan.

76.     Because the participant loan is made from TIAA's general account, the participant is obligated to repay the loan to TIAA's general account, and the general account earns all of the interest paid on the loan, in contrast to the loan programs for virtually every other retirement plan in the country, where the loan is made from and repaid to the participant's account and the participant earns all of the interest paid on the loan.

77.     Any reasonable plan fiduciary who had performed a diligent and prudent review of this loan process should have been able to recognize the self-dealing inherent in the loan process and the inconsistencies with laws and regulations governing plan loans.

78.     These failures are not insignificant nor without consequence. The singular focus of the regulatory efforts of the Employee Benefits Security Administration of the Department of Labor for the past ten years or more has been the enhancement of reporting of plan financial information because of its critical importance to participants, who bear the burden of investment decisions, in effectively planning for their retirement. Even worse than ignorance on the part of participants, however, is the prospect of ignorance on the part of Plan fiduciaries who are charged

---

[2] Effective in July 2016, loan "collateral" was invested in a TIAA Retirement Loan certificate.

with protecting the interests of those participants.  The complete and utter failure to report TIAA's indirect compensation suggest that Defendant does not know what that compensation is.

79.     Likewise, the approval of a loan process that is in clear violation of ERISA rules and that is designed to generate profits for TIAA at the expense of Plan participants provides demonstrable proof of Defendant's flawed fiduciary decision-making process.  Defendant's failure to comprehend and act on the compensation scheme created by TIAA for its participant loan program simply cannot be explained.

## ERISA'S FIDUCIARY STANDARDS

80.     ERISA imposes strict fiduciary duties of care, prudence and diligence upon the Defendant as fiduciary of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aiDr.

81.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of service providers, must act prudently and solely in the interest of participants in the plan.

## CLASS ACTION ALLEGATIONS

82.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

83.     Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries with an active account balance in the University of Long Island Retirement Plan from May 4, 2012 through the date of judgment.

84.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The Class includes over 4,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to this Class because the Defendant owed fiduciary duties to the Plan and to all participants, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who is/are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of a fiduciary duty breach.

c.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were Plan participants with an active account balance during the time period at issue in this action and all participants in the Plan were harmed by Defendant's actions.

d.     Plaintiffs are an adequate representatives of the Class because they were a participant in the Plan during the Class period, they have no interests that are in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged

experienced and competent attorneys to represent the Class.

      e.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

85.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

86.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## COUNT I

### ERISA Breach of Duty of Prudence
### (Excessive and Unreasonable Administrative Fees and Expenses)

87.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

88.     ERISA § 404(a)(1) imposes twin duties of prudence and loyalty on fiduciaries of retirement plans. The duty of prudence, codified in ERISA § 404(a)(1)(B), requires a pension plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aiDr." ERISA § 404(a)(1)(B).

89.     Defendant breached its duty of prudence with regard to TIAA's excessive administrative fees. The breach arose from the following actions and inactions: (1) failing to solicit competitive bids from other recordkeepers; (2) failing to monitor and control administrative fees by not (a) monitoring the amount of TIAA's fees; (b) determining the competitiveness/reasonability of the fees; or (c) leveraging the Plan's size to reduce fees.

90.     Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged by TIAA for fees, allowing the Plan to be charged an asset-based fee calculated in a manner that was completely inconsistent with a reasonable fee for the services provided and was grossly excessive for the services being provided.

91.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all Plan participants, respectfully request that the Court:

1.      Find that Defendant has breached its fiduciary duties as described above;

2.      Find that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which the Plan's losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.      Certify the Class, appoint Plaintiffs as class representatives, and appoint Zaremba Brown, PLLC and Carlson Lynch Sweet Kipela & Carpenter, LLP as Class Counsel;

6.      Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

7.      Order the payment of interest to the extent it is allowed by law; and

8.      Grant other equitable or remedial relief as the Court deems appropriate.

Dated: May 15, 2018

By: _____

DANIEL T. GLUCK, ESQ.
ZAREMBA BROWN, PLLC
40 Wall Street, 52nd Floor
New York, NY 10005
Telephone: (212) 380-6700
Facsimile: (212) 871-6395
*Attorneys for Plaintiffs*

By:  /s/ Benjamin J. Sweet*
    Benjamin J. Sweet*
    Kevin Abramowicz*
    **CARLSON LYNCH SWEET**
    **KIPELA & CARPENTER LLP**
    1133 Penn Ave., 5th Floor
    Pittsburgh, Pennsylvania 15222
    Telephone: (619) 756-6994
    Facsimile: (619) 756-6991
    bsweet@carlsonlynch.com
    kabramowicz@carlsonlynch.com

    *Attorneys for Plaintiffs*

    *(Pro Hac Vice Admission Pending)*